# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**CRAIG D. DOYLE**
**KURT V. LAKER**
Doyle Legal Corporation, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**G. MARTIN COLE**
**JEREMY J. GROGG**
Burt, Blee, Dixon, Sutton & Bloom, LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| WELLS FARGO BANK, N.A., successor in interest to The Money Store Investment Corporation, f/d/b/a First Union Small Business Capital, | ) ) ) ) ) | |
| Appellant, | ) ) | |
| vs. | ) ) | No. 02A04-1103-CP-112 |
| NEAL A. SUMMERS, et al., | ) ) | |
| Appellees. | ) | |

APPEAL FROM THE ALLEN CIRCUIT COURT
The Honorable Allen N. Wheat, Judge
Cause No. 02C01-0109-CP-1341

**August 27, 2012**

**OPINION ON REHEARING - FOR PUBLICATION**

**BROWN, Judge**

Wells Fargo Bank, N.A. ("Wells Fargo"), successor in interest to The Money Store Investment Corporation, f/d/b/a First Union Small Business Capital, petitions for rehearing following our memorandum decision dismissing its appeal. In that decision, we concluded that the notice of appeal was untimely pursuant to Ind. Trial Rule 53.3 and Ind. Appellate Rule 9. In its petition for rehearing, Wells Fargo acknowledges that this court's opinion was correct based upon the record it presented but states that the record was not complete. Wells Fargo subsequently filed a Verified Emergency Motion for Leave to Correct Clerk's Record and Supplement Appendix, which this court granted. An amended notice of completion of the clerk's record was also filed. Based upon the amended record, we conclude that Wells Fargo's notice of appeal was timely, vacate our prior decision, and proceed to determine the issues raised by Wells Fargo in its initial brief. [1] Wells Fargo raises five issues which we consolidate and restate as whether the trial court erred in determining the amount of Paula Phillips's lien. We affirm in part and remand.

CASE HISTORY

This is the third appeal in this case. The relevant facts as discussed by the Indiana Supreme Court in the first appeal follow.

> From 1992 to 1996, Neal Summers granted eleven mortgages on three parcels of his real estate to Fort Wayne National Bank as security for a series of loans. Three of these mortgages contained dragnet clauses.[2]

---

[1] Wells Fargo's forty-two page appellant's brief does not contain a table of contents as required by Ind. Appellate Rule 46(A).

[2] Generally, a "dragnet clause" is defined as "[a] clause stating that a mortgage secures all the debts that the mortgagor may at any time owe to the mortgagee." BLACK'S LAW DICTIONARY 1036 (8th ed. 2004).

In February 1998, Paula Phillips sued Summers and the company in which he was the sole shareholder, Mangy Moose Enterprises, Inc. Her complaint raised a dispute over the ownership of the trademark/trade name "Paula's Seafood." The parties entered into a written settlement agreement on September 21, 1999, and the suit was subsequently dismissed without prejudice.

On September 15, 2000, Summers and Mangy Moose borrowed $508,275 from the Money Store Investment Corporation d/b/a First Union Small Business Capital and granted a mortgage on the same three parcels used to secure the Fort Wayne National mortgages (to which National City succeeded), plus an additional six lots. On the same day, Mangy Moose, by Summers as president and secretary, borrowed $471,000 from Money Store, and granted a mortgage on the same real estate.

Prior to these loans, on August 30, National City sent to Money Store's title company three pay-off statements that included the daily interest. National City assured the title company that eight mortgages and two assignments of rents and leases would be released upon the proper payoff of the three loans. On September 15, National City received three payments, but one payment came up $375 short of the amount reflected on the pay-off statements. National City did not release any of the mortgages and was still owed some $4700 on Mangy Moose's overdrawn checking account.

Phillips filed a motion to enforce the settlement agreement on August 10, 2001. Just over a month later, Money Store filed a complaint for foreclosure and appointment of a receiver. On February 5, 2002, the trial court in the Phillips' action found that Summers and Mangy Moose had failed to comply with an earlier order and granted Phillips a $205,700 judgment.

Phillips then purchased National City's nine mortgages and two assignments of rents and leases, and National City assigned all of its interest to Phillips. In March 2002, Phillips filed a complaint to foreclose these mortgages, and also moved to intervene in the Money Store foreclosure action. Both Phillips and Money Store moved for summary judgment.

The trial court entered its judgment and decree foreclosing both Phillips' and Money Store's mortgages. It held that "dragnet" clauses contained in three of the mortgages assigned to Phillips secured "all debts or obligations owed to Paula Phillips by Summers," which included Phillips' judgment lien against Summers, Mangy Moose's overdrawn

3

checking account, collection fees, attorneys fees, and interest. It granted Phillips priority over Money Store on the three Summers' lots used as collateral in the mortgages assigned to Phillips.

The Court of Appeals affirmed, holding that "the mortgage dragnet clauses support[ ] the trial court's conclusion that the monetary judgment resulting from Summers' failure to comply with his written settlement agreement was, after Phillips acquired the mortgage through assignment by National City, 'secured by' the dragnet mortgages." The Money Store Inv. Corp. v. Summers, 822 N.E.2d 223, 229 (Ind. Ct. App. 2005) vacated.

The Money Store Inv. Corp. v. Summers, 849 N.E.2d 544, 546-547 (Ind. 2006) ("Money Store I") (citations and footnote omitted). We also addressed whether the trial court committed reversible error when it failed to strike portions of affidavits submitted by Phillips, whether the court erred in finding Summers personally liable for the debts of Mangy Moose, and whether the court erred in granting Phillips an award of attorney fees. 822 N.E.2d at 225. With respect to the attorney fees, we observed that at least one of Phillips's assigned mortgages contained express authorization for attorney fees and held that Money Store failed to meet the burden of demonstrating that the trial court's grant of summary judgment was erroneous. Id. at 233-234.

The Indiana Supreme Court granted transfer and summarily affirmed the disposition of the issues regarding the admissibility of the affidavits, Summers's personal liability, and attorney fees. Money Store I, 849 N.E.2d at 550 n.3. With respect to the priority of Phillips, the Court concluded as follows:

> While it is true that Phillips stepped into the shoes of the mortgagee, this entitled her to collect debts secured in accordance with the terms of the mortgages, not her judgment lien. The debts in this case were limited to the $375 short payment on the loan payoff and the $4700 overdrawn checking account, plus interest, collection costs, and attorney's fees. We reverse the trial court's grant of priority to Phillips over Money Store on the lots in question.

4

Id. at 548.

After the decision of the Indiana Supreme Court, Phillips and Money Store stood in the following order of priority: (1) Phillips as assignee of the National City mortgages for the amounts as limited by the Supreme Court, including $5,181.25 for the debt from Summers plus interest and attorneys fees; (2) Money Store for its foreclosure judgment, including $569,470.28 plus interest and attorney fees; and (3) Phillips for her $205,700 judgment against Summers. The Money Store Investment Corp. v. Summers, 909 N.E.2d 450, 456 (Ind. Ct. App. 2009) ("Money Store II"), reh'g denied.

The facts relevant to the second appeal occurred for the most part between the judgment of foreclosure by the trial court on December 4, 2003, and the affirmance of that judgment by this court on April 18, 2005. Id. In Money Store II, we stated the following facts:

> The dispute between Phillips and Summers that led to her judgment against him concerned a restaurant that Phillips had operated for some years in part of the buildings on the subject property. When she began operations, the property was owned by someone other than Summers. After Summers acquired the property, he became more and more involved in the operation of the restaurant, which eventually led to Phillips leaving and suing Summers and Mangy Moose, a corporation formed by Summers.

> Phillips obtained her money judgment against Summers and Mangy Moose on February 5, 2002. By that time, Summers had apparently left the country for New Zealand, and Money Store had filed to foreclose and have a receiver appointed. The receivership was never consummated, but Don Young operated the restaurant on the premises from around March 2002 until August 2003, when he abandoned the project and the restaurant was closed.

> Left empty, the one-hundred-year-old property was vandalized and burglarized. Summers was gone and Money Store did not qualify a

5

receiver or enter the property to secure its interests. Watching the property deteriorate, Phillips eventually decided to take remedial action to secure it.

Before beginning repairs or paying taxes, Phillips and her lawyer had several telephone conferences with Money Store representatives regarding the deteriorating condition of the property and the need for repairs. The Money Store representatives agreed that something needed to be done and indicated that Phillips should go ahead. The Money Store people did not agree to pay for anything, or that the costs would be a part of Phillips' mortgage claim.

Because Phillips lacked the financial ability to make the necessary repairs to the restaurant, she turned to Frank Casagrande, Thomas Sokolik, and their limited liability partnership T & F, LLP. At Phillips' request, T & F obtained a $150,000 loan to begin the process of repairing the restaurant. T & F provided an additional $60,000. Although there was no written contract, Phillips agreed to repay T & F the $210,000 spent on the restaurant repairs. Phillips, Casagrande, and Sokolik subsequently formed 412323, LLC, to operate the restaurant and a seafood market upon completion of the repairs. The work done included repairs to the leaking roof, broken windows, floors, unstable structure and foundation, termite damage, water damaged ceilings, faulty electrical and HVAC systems, unusable plumbing, and damaged drywall. The bulk of the repair work was done in 2004. Paula's Restaurant opened for business on November 30, 2004.

On January 4, 2006, T & F, along with Craftsman Building Services, the contractor responsible for much of the repair, and 412323, filed a complaint against Phillips asserting a mechanic's lien on the real estate and an unjust enrichment claim against Phillips. The trial court dismissed the complaint on March 30, 2006, for failure to state a claim pursuant to Trial Rule 12(B)(6) because Phillips was not an owner of the real estate pursuant to the statutory definition and thus had no lienable interest in it.

Also during the pendency of the first appeal, Phillips learned that several of the lots composing the real estate had been sold at a tax sale because neither Summers nor Money Store had paid the taxes on them. With the assistance of T & F and 412323, Phillips redeemed several of the lots as well as certain outlots. She also paid the annual property taxes on all of the parcels after she redeemed them. In addition, Phillips paid the premiums for commercial property and casualty insurance coverage on the property.

6

In March 2005, a month following this court's affirmance of the trial court in the first appeal, Phillips filed a Petition for the Recovery of Property Tax Payments, Insurance Payments, Utility Payments, and Payments for Necessary Repairs to the Mortgaged Property. The trial court decided to defer action on the petition until the appeal was concluded. Phillips subsequently filed two petitions for post-judgment attorney fees on appeal. Five months later, the Indiana Supreme Court granted transfer in Money Store I. In June 2006, the Supreme Court issued its opinion reversing the trial court's grant of priority to Phillips over Money Store as to her judgment against Summers and Mangy Moose. See The Money Store Investment Corporation v. Summers, 849 N.E.2d 544 (Ind. 2006). At the August 2007 hearing on Phillips' March 2005 petitions, Phillips introduced into evidence invoices and copies of checks paid for the repairs to the building, insurance premiums, taxes, and attorney fees. Also at the hearing, Phillips testified that insurance premium payments were for business and commercial liability insurance, not for health or personal injury.

Since the opening of the restaurant in November 2004, the restaurant has taken in gross revenues between $1,000,000 and $1,250,000 per year. These revenues have paid all of the restaurant's ordinary operating expenses. In addition, the restaurant has paid Phillips a salary of over $30,000 per year and had also paid $500 per month for her health insurance. Casagrande and Sokolik each receive a salary of $13,000 per year. Further, the restaurant has been paying $1,500 per month on the bank loan that funded the renovations and has paid $15,000 back to T & F. Phillips, Casagrande, and Sokolik have also each received a $5,000 dividend from the restaurant.

In May 2008, the trial court issued a 56-page judgment, which reviewed in detail the facts of the case as well as all of the invoices, checks, and evidence admitted into evidence at the hearing. In essence, the trial court found that Phillips was entitled to recover, in addition to the amounts due with respect to the National City mortgages as held by the Supreme Court, and with the same priority, the expenditures for repairs (excluding those disallowed by the trial court), taxes, and insurance. The decision of the trial court established the following priorities as to the proceeds of foreclosure sale of the property: 1) Phillips as to the balance due on the National City mortgages, including interest and attorney fees and the costs of repair, taxes, and insurance, approximately $360,657.65 plus interest and attorneys fees; 2) Money Store for its foreclosure judgment, including $569,470.28 plus interest and attorneys fees; and 3) Phillips for her $205,700 judgment against Summers.

In addition, the trial court found Money Store liable to Phillips as follows:

> IT IS ORDERED, ADJUDGED AND DECREED THAT, taking all of the aforementioned amounts into consideration, Paula is awarded a total recovery and judgment from the Money Store of $355,467.40 for total amounts expended on the Real Estate, including attorney fees, plus total accrued interest, all of which is secured by a first priority lien on the Real Estate.

Id. at 456-458 (citations omitted).

In Money Store II, we noted that "the parties agree that the trial court's judgment in this case supplements rather than replaces the court's December 2003 judgment foreclosing both Phillips' and Money Store's mortgages." Id. We observed that "[t]he parties' mortgages are still foreclosed, and the real estate should proceed to sheriff's sale following the accounting ordered here on remand." Id. In part, we held that the trial court did not err in awarding Phillips a first priority lien on the real estate, and that Phillips was entitled to recover attorney fees by virtue of the agreements for same in the mortgages assigned to her. Id. at 459-461. We reversed the part of the judgment that held Money Store personally liable to Phillips and held that "it is appropriate . . . to allow priority as to foreclosure sale proceeds but not to impose personal liability to Phillips on Money Store." Id. at 461.

We also addressed Money Store's argument that the trial court erred in failing to order an accounting and an application of the restaurant's profits to Phillips's first priority lien for the cost of repairs, insurance payments, and tax payments. Id. at 462. We ordered "an accounting for the profits of the restaurant to be applied to the amount

8

due on Phillips' first lien" and otherwise affirmed the judgment of the trial court.  Id. at

462-463.  Specifically, we held:

> In support of her response that she has no obligation to account for any rents or profits from her use of the real estate, Phillips directs us to Adkins v. Hudson, 19 Ind. 392 (1862) and White v. Redenbaugh, 41 Ind.App. 580, 82 N.E. 110 (1907).  However, Adkins is not apposite because it was an action under the occupying claimants statute where the occupying claimant is not liable to the true owner for the value of the rent attributable solely to improvements made by the occupying claimant in good faith.  White is not apposite either.  Therein, an absolute deed to White by Redenbaugh was held to be a mortgage.  Because Redenbaugh remained in possession, White had no claim to Redenbaugh's rents and profits.  It has nothing to do with a claim that a mortgagee in possession must account for profits from use of the mortgaged property against the debt owed by the mortgagee.

> We find Gaskell v. Viquesney, 122 Ind. 244, 23 N.E. 791 (1890), to be more instructive.  There, in facts similar to those before us, the Indiana Supreme Court explained as follows:

>> It is believed to be the universal rule, in all cases where the mortgagee takes and retains possession of the mortgaged premises under his mortgage that he must account for the rents and profits received by him from the premises while he holds the same under his mortgage. . . .  This right to compel an accounting for rents and profits extends, also, to a junior incumbrancer. He may compel a senior mortgagee, who has been in possession under his mortgage, to account to the same extent and in the same manner as the mortgagor might compel an accounting. His right to compel such an accounting does not rest upon any obligation of the senior mortgagee to him, for there is no contract between them, but it rests upon the fact that the senior mortgagee is under obligation to the mortgagor to account and that by reason of his junior lien he has the right, in equity, to stand in the place of the mortgagor, and compel the application of the rents and profits to the satisfaction of the senior mortgage. . . . .

> Id. at 792.

> Our review of the evidence reveals that Phillips has a $355,467.40 first priority lien on the real estate based upon her repairs and work on the restaurant.  Because of Phillips' expenditures, she was able to reopen an

9

apparently popular restaurant that has taken in gross revenues between $1,000,000 and $1,250,000 per year. These revenues have paid all of the restaurant's ordinary operating expenses, salaries and dividends for Phillips, Casagrande, and Sokolik, health insurance for Phillips, and payments on the bank loan that funded the renovations as well as on the debt to T & F. To grant priority to Phillips' investment in repairing the restaurant, without crediting the lien amount with the profits from such investment, has no equity in it. Money Store, the junior incumbrancer, clearly has the right to compel an accounting and an application of the rents and profits to the senior lien. See id. The trial court erred in failing to order an accounting.

To sum up, we reverse the personal judgment against Money Store; we order an accounting for the profits of the restaurant to be applied to the amount due on Phillips' first lien; we otherwise affirm the judgment of the trial court; and we remand to the trial court for further proceedings consistent with this opinion.

Id. (footnote omitted).

Wells Fargo filed a petition for rehearing in which it argued that the court should "grant rehearing for the limited purpose of clarifying the legal standards for the accounting to be rendered on remand." Appellant's Appendix at 411. In response, Phillips argued that Wells Fargo's petition was premature because "at no time whatsoever have the parties briefed or otherwise argued the issue of the manner in which such rents and/or profits should be determined or calculated." Id. at 474. We denied rehearing.

On August 18, 2009, Phillips filed a Petition for Attorney's Fees on Second Appeal and a Further Supplemental Petition for Recovery of Property Tax Payments and Insurance Payments on the Mortgaged Property. On September 18, 2009, Phillips filed her Final Petition for Recovery, Accounting for Rents and Profits and a Supplemental Affidavit of Legal Services with Regard to Post-Judgment Attorney Fees and Recovery of Property Tax Payments and Insurance Payments.

10

On August 13, 2010, Wells Fargo filed its trial brief and argued that the correct measure for purposes of accounting was the fair rental value of the real estate as improved. On August 24, 2010, Phillips filed her trial brief and Supplemental Affidavit of Legal Services with Regard to Post-Judgment Attorney Fees and Recovery of Property Tax Payments and Insurance Payments. Phillips conceded that "the simple rule is that a reasonable rental value is the value to be charged to the mortgagee in possession, without regard to profits or losses that may or may not have been realized," but argued that equity requires that the actual profit realized be the amount utilized. Id. at 567. Specifically, Phillips argued that "[t]he logical approach is to either use rent or profit, one or the other, not the one that works to the greatest benefit to the party that has sat back and contributed nothing to the value, use or preservation of the Real Estate." Id. at 568. Phillips argued that "where a party actually occupies and uses the property for business purposes, profit is the only true measure that accurately measures any benefit received from said use," and that "this is also the approach that the Court of Appeals determined to be proper when in its most recent opinion it proscribed that this matter be remanded for 'an accounting for the profits of the restaurant to be applied to the amount due on Phillips' first lien.'" Id.

On August 25 and 26, 2010, the court conducted a bench trial upon the accounting ordered by the Court of Appeals on remand, and upon Phillips's various applications to recover additional attorneys' fees, and tax and insurance payments.

On October 14, 2010, the court entered judgment finding that Phillips had a first priority lien to be satisfied upon the real estate being sold at foreclosure sale effective

11

August 31, 2010 in the amount of $443,727.09 and that Phillips recover her costs of the sale including but not limited to reasonable attorneys' fees and post-judgment interest accruing after August 31, 2010. Specifically, the court found:

A.   Amount of First Priority Lien –

1.   On May 30, 2008, this Court awarded to Phillips a first priority lien in the amount of $355,476.40.

2.   The Court at this time incorporates by reference all Findings of Fact heretofore set forth in the prior Judgment of this Court and not being in conflict with the Remand Order of the Indiana Court of Appeals.

3.   Because of the substantial lapse of time since May 30, 2008, Phillips seeks from the Court an increase in the amount of her first priority lien to reflect the fact that since May 30, 2008 she has paid or accrued debt for additional taxes, insurance and attorney fees. Further, interest continues to accrue on the amounts comprising Phillips' first prior lien as previously established by the Court.

4.   The Court finds that subsequent to May 30, 2008, Phillips has incurred additional expenses, exclusive of attorney fees, as mortgagee in possession of the real estate for which she should have added to her first priority lien along with legal interest as permitted by law.

5.   The additional expenses incurred by Phillips are taxes in the amount of $49,635.42 paid on or about August 3, 2009, and taxes in the amount of $5,634.66 paid on or about May 6, 2010.

6.   The Court finds that Phillips should have added to her first priority lien these taxes along with interest computed at the rate of ten percent (10%) per annum.

7.   The Court has previously awarded to Phillips for attorney fees and expenses the amount of $71,224.02, plus legal interest.

8.   Phillips at this time seeks to have added to her first priority lien the additional amount of attorney fees and expenses incurred through August 31, 2010 in the sum of $92,391.70.

12

9.    The Court finds that some, but not all, of the additional attorney fees and expenses of litigation incurred by Phillips should be credited toward her first priority lien.

10.   The amount of $20,000.00 was incurred by Phillips in arguing on appeal that she should not be required to account for the profits she was realizing in her capacity as mortgagee in possession. Phillips' argument regarding profits did not prevail on appeal.

11.   The Court is aware that a mortgage appearing in the chain of title of Phillips authorizes her, as mortgagee, to recover as costs reasonable attorney fees in protecting her lien. This Court, however, can look at all of the surrounding circumstances of the litigants before it in determining what amount constitutes a reasonable attorney fee.

12.   Having done so, the Court finds that Phillips should be awarded additional attorney fees and expenses of litigation in the amount of $72,391.70.

13.   By way of recapitulation, the Court finds that Phillips is entitled to recover against the subject real estate as first priority lien holder through August 31, 2010 the amount of $627,570.84 computed as follows:

|                      | Principal     | Interest    | Total       |
|----------------------|---------------|-------------|-------------|
| Original Judgment    | 28,278[.]52   | 15,266.47   | 43,544.99   |
| **Taxes**            |               |             |             |
| Pre 2010 payments    | 125,177.62    | 49,090.90   | 174,268.52  |
| 2010 payments        | 5,634.66      | 1,986.66    | 7,621.32    |
| Insurance Payments   | 18,950.00     | 4,747.09    | 23,697.09   |
| Repairs              | 149,852.57    | 66,096.41   | 215,948.98  |
| **Attorney Fees**    |               |             |             |
| Prior Award          | 71,224.02     | 18,874.22   | 90,098.34   |
| Additional Award     | 72,391.70     |             | 72,391.70   |

13

TOTALS                471,509.09      156,061.75      627,570.84[3]

Interest has been computed through August 31, 2010.

B.    Profits –

14.    The Remand Order of the Indiana Court of Appeals specifically directed this Court to do the following:

" . . . account for the profits of the restaurant to be applied to the amount due on Phillips' first lien . . ."

15.    In so doing, the Indiana Court of Appeals at page 462 of its opinion observed:

"Our review of the evidence reveals that Phillips has a $335,467.40 first priority lien on the real estate based upon her repairs and work on the restaurant. Because of Phillips' expenditures, she was able to reopen an apparently popular restaurant that has taken in gross revenues between $1,000,000.00 and $1,125,000.00 per year. These revenues have paid all of the restaurant's ordinary operating expenses, salaries and dividends for Phillips, Casagrande, and Sokolik, health insurance for Phillips, and payments on the bank loan that funded the renovations as well as on the debt to T&F. To grant priority to Phillips' investment in repairing the restaurant, without crediting the lien amount with the profits from such investment, has no equity in it. Money Store, the junior incumbrancer, clearly has the right to compel an accounting and an application of the rents and profits to the senior lien . . ." (Emphasis added)

16.    Phillips and Money Store take divergent views as to how the word "profits" should be defined by this Court for purposes of complying with the Remand Order of the Indiana Court of Appeals.

17.    Phillips contends the Indiana Court of Appeals intended for the profits of the business to be determined through the application

---

[3] This amount appears to be a computation error and in fact the number should be 627,570.94.

14

of normal and customary accounting principles as one would utilize in the preparation of an Income Statement.

18. Money Store, on the other hand, cites to this Court cases that hold a mortgagee in possession should have charged against its first priority lien the "fair rental value" of the mortgaged real estate, without regard to profits, during the time it occupied the real estate as a mortgagee in possession. Alternatively, Money Store contends that this Court should at least reduce the amount of Phillips' first priority lien by the greater of the amount of net profits earned while in possession or the fair rental value of the business.

19. This Court finds that the Indiana Court of Appeals in its Remand Order intended for the "profits" of the business to be computed in the manner they would be computed if one were preparing an Income Statement. If the Indiana Court of Appeals would have intended otherwise there would have been no need for the Indiana Court of Appeals, as set forth above at Finding #15, to specifically reference the accounting concepts of gross revenue, ordinary operating expenses, salaries, dividends and loan repayments. Further, it appears to this Court, that if the Indiana Court of Appeals wanted only for the "fair rental value" of the subject real estate to be ascertained on remand by this Court it would have simply directed this Court to do so.

20. In no event would this Court adopt the argument of Money Store that Phillips' first priority lien should be reduced by the greater of the net profits earned by the business or its fair rental value. To do so, would create a disincentive to entrepreneurs such as Phillips to reenter, make necessary repairs and operate the business to the potential benefit of all creditors.

21. The Court finds that Phillips earned net profits from the operation of the restaurant in the amounts hereinafter set forth:

    a) 2004 – ($13,585.93)
    b) 2005 – $44,781.68
    c) 2006 – $45,526.18
    d) 2007 – $12,653.95
    e) 2008 – $548.61
    f) 2009 – $18,353.43
    g) 2010 – (part year) – ($15,919.41).

15

TOTAL NET PROFITS – $92,361.51.

22.     During the course of trial, it became apparent to the Court and counsel, that the experts selected by the litigants to testify had twice subtracted certain expenses in their net profit calculations for the restaurant. They were unaware that this Court had previously calculated certain expenses and made same a part of the first priority lien determined to be owed to Phillips in the amount of $355,476.40.

23.     Counsel stipulate, and the Court so finds, that the net profit figure of $92,361.51 must be adjusted upward to reflect the error made by the parties' experts as follows:

     a)  Taxes – $59,198.00
     b)  Insurance – $18,950.00
     c)  Repairs – $13,334.24

     TOTAL ADJUSTMENT:     $91,482.24.

24.     With the above and foregoing adjustments having been made, the Court finds that the total net profits earned by Phillips as directed to be calculated by this Court on remand are in the amount of $183,843.75 ($92,361.51 + $91,482.24 = $183,843.75).

25.     The Court finds that Phillips has a first priority lien against the subject real estate effective August 31, 2010 in the amount of $443,727.01[4] ($627,570.84 - $183,843.75 = $443,727.09).

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED as follows:

1.     Phillips has a first priority lien to be satisfied upon the real estate being sold at foreclosure sale effective August 31, 2010 in the amount of $443,727.09.

2.     Additionally, she shall recover her costs of sale, including but not limited to reasonable attorney fees and post-judgment interest accruing after August 31, 2010.

Id. at 72-77.

---

[4] This amount appears to be a typographical error as the calculation in the parenthetical provides the correct amount of $443,727.09.

On November 12, 2010, Wells Fargo filed a motion to correct errors alleging that the court erred when it "treated the amount of Phillips' profits from 2005 through 2010 (totaling $183,843.75), as if it were a payment against Phillips' claim made on October 14, 2010," instead of "applying each year's profit to reduce Phillips' claim at the end of year, beginning December 31, 2005." Id. at 656. Wells Fargo argued that the court "must not allow Phillips to continue accruing interest through 2010 on portions of her claim that she repaid herself in 2005 or 2006." Id. at 657. Wells Fargo also argued that the court's judgment was "silent . . . as to Phillips' profits for months after August of 2010" and that the court "should have ordered Phillips to continue applying her post-judgment profits to reduce her claim until the property is sold." Id. at 658. Wells Fargo contended that "[i]f the Court does not revise this aspect of its judgment, Phillips will be allowed to flout the established rule that a mortgagee in possession may not make a profit out of her possession of the real estate" and that a "ruling that allows Phillips to keep the profits she earns after August of 2010 violates the intent of the Court of Appeals' decision." Id. Lastly, Wells Fargo argued that the court's award of $49,635.42 for 2009 real estate taxes on the mortgage property and $5,634.66 for 2010 real estate taxes was contrary to the evidence. Specifically, Wells Fargo argued, without citation to the record, that "Phillips' mortgages allow her to recover taxes that she pays, but do not allow her to recover – at [Wells Fargo's] expense – tax payments she did not make, and is apparently under no obligation to reimburse." Id. at 659-660.

On January 31, 2011, the court held a hearing on Wells Fargo's motion and at the end of the hearing the court stated that "it would appear that counsel are willing to agree

17

and stipulate as to the matter of an increase or a decrease in the overall judgment of this Court if the sale, at some point in time if the sale was to occur based upon the profits or loss of this business." Transcript at 309. That same day, the parties filed a stipulation which stated:

> The parties, by counsel, stipulate to providing a statement of account in the form of a profit/loss statement from August 1, 2010, through the month prior to Sheriff's Sale of the mortgage property to be prepared by the Accountant for Paula's on Main, LLC, Rex Harris C.P.A. Depending on whether the restaurant operations have generated a profit or suffered a loss, the [judgment] shall be reduced (in the amount of any profit) or increased (in the amount of any loss[)].

Appellant's Appendix at 673. On February 8, 2011, the court ordered that the judgment of October 14, 2010, be amended to incorporate the stipulation of counsel and denied the remainder of Wells Fargo's motion to correct error.

## DISCUSSION AND ANALYSIS

The issue is whether the court erred in determining the amount of Phillips's lien. The trial court entered findings and conclusions *sua sponte*. *Sua sponte* findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. Yanoff v. Muncy, 688 N.E.2d 1259, 1262 (Ind. 1997). A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. Id. We apply the following two-tiered standard of review to *sua sponte* findings and conclusions: whether the evidence supports the findings and whether the findings support the judgment. Olcott Intern. & Co., Inc. v. Micro Data Base Sys., Inc., 793 N.E.2d 1063, 1071 (Ind. Ct. App. 2003), trans. denied. Findings will only be set aside if they are clearly erroneous. Yanoff, 688 N.E.2d at 1262.

18

Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. Id. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. Id. In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. Id.

Wells Fargo argues that the trial court erred in: (A) concluding that Money Store II constituted the law of the case; (B) calculating the profits when it deducted certain interest expenses and salaries; (C) applying Phillips's rents and profits or alternatively the fair market rental value as a lump-sum credit against her claim as of the date of judgment, rather than applying such rents and profits as they accrued; (D) allowing Phillips to recover tax payments; and (E) allowing Phillips to recover attorney fees incurred to make an accounting.

A.    Law of the Case

Wells Fargo argues that our reference in Money Store II to profits did not establish the law of the case with respect to whether fair rental value or profits should be calculated on remand and that the trial court misapprehended this court's mandate in Money Store II. Wells Fargo contends that this court's decision in Money Store II "clearly did not 'conclusively decide' the question presented here: precisely how, on remand, the Trial Court should compute the reduction in Phillips' claim required by her use of the Real Estate to operate a restaurant." Appellant's Brief at 21. Wells Fargo asserts that although the ruling in Money Store II "referred to 'an accounting for the profits of the restaurant,' such language did not establish the law of the case, tying the Trial Court's

hands on remand." Id. at 23. Wells Fargo also contends that "it is hard to see why this Court would have referred to the 'application of the <u>rents</u> and profits' if this Court did not want the Trial Court to consider anything but the profits generated by the restaurant." Id. Wells Fargo argues that "[b]y declining to measure Phillips' 'rents and profits' by the fair rental value of the Real Estate, the Trial Court contravened the Indiana Supreme Court's holding that 'a mortgagee in possession is chargeable with the <u>rental value</u> of the property." Id. at 15 (quoting <u>Hosford v. Johnson</u>, 74 Ind. 479, 484 (1881)). Wells Fargo argues that "a mortgagee is chargeable with fair rent even if [the] mortgagee <u>lost</u> money doing business on the real estate." Id. at 16. Wells Fargo contends that "[t]he requirement that a mortgagee must pay fair rent for occupying the mortgaged real estate derives from the more basic rule that a mortgagee who takes possession of the mortgaged property acts as a trustee or bailee for the owner and junior lienholders, and thus cannot exploit his or her possession of the property to reap a benefit, but must use any proceeds from the property to pay down the debt secured by the mortgage." Id.

Phillips argues that the law of the case doctrine required that the trial court follow the instruction that her profits be accounted. Phillips also argues that the most equitable approach is to require her to account for the lesser of the rental value or the profit and that "[t]his is the only approach that can be followed to prevent a sleeping party such as Money Store from reaping a windfall born from the labors of another." Appellee's Brief at 23. Phillips argues that "if she is forced to account for profit exceeding the rental value of the property, not only will there be a disincentive to utilize the Real Estate in a beneficial manner, Money Store will be rewarded with a windfall for contributing

20

nothing to its preservation." Id. Phillips also argues that "[w]hat gets lost in this entire discussion is the fact that we would not be talking about 'fair rental value' or 'profits' had Phillips not acted in the proactive manner in which she did." Id. at 24.

"The doctrine of the law of the case is a discretionary tool by which appellate courts decline to revisit legal issues already determined on appeal in the same case and on substantially the same facts." Cutter v. State, 725 N.E.2d 401, 405 (Ind. 2000) (citing Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817-818, 108 S. Ct. 2166 (1988); State v. Lewis, 543 N.E.2d 1116, 1118 (Ind. 1989)), reh'g denied. "The purpose of this doctrine is to promote finality and judicial economy." Id. "The doctrine of the law of the case is applied only 'to those issues actually considered and decided on appeal.'" Id. (quoting 4A Kenneth M. Stroud, Indiana Practice § 12.10 (2d ed. 1990) (emphasis omitted)).

As pointed out in Money Store II, the Indiana Supreme Court has held that "[i]t is believed to be the universal rule, in all cases where the mortgagee takes and retains possession of the mortgaged premises under his mortgage that *he must account for the rents and profits received by him from the premises* while he holds the same under his mortgage." Gaskell v. Viquesney, 122 Ind. 244, 247, 23 N.E. 791, 793 (1890) (emphasis added). In Money Store II, we did not mention fair market rental value and any mention of rents was merely tangential. Rather, we emphasized an accounting of the restaurant's profits. Specifically, we phrased Money Store's argument as whether the "the trial court erred in failing to order an accounting and an application of the restaurant's *profits* to Phillips' first priority lien for the cost of repairs, insurance payments, and tax payments."

21

909 N.E.2d at 462 (emphasis added). We also held that "[t]o grant priority to Phillips'

investment in repairing the restaurant, without crediting the lien amount with the *profits*

from such investment, has no equity in it." Id. (emphasis added). Further, we concluded

by ordering "an accounting for the *profits* of the restaurant to be applied to the amount

due on Phillips' first lien . . . ." Id. at 462-463 (emphasis added). We conclude that

Money Store II constitutes the law of the case and next turn to addressing whether the

trial court correctly calculated the restaurant's profits.[5]

B.      Deduction of Interest Expenses & Salaries

---

[5] We observe that other jurisdictions have held that fair market value is the appropriate measure. Professors Nelson and Whitman addressed the issue before us as follows:

> When a mortgagee occupies the premises itself instead of leasing them several questions arise. One is whether there is any duty to work or operate it in case mortgagee has tried with due diligence to rent it and failed. The answer should be yes and there is authority so holding, at least in the case of a farm. If the mortgagee retains possession when it finds that it cannot rent the property, it should have to work it or, if not, should be held for the fair rental value. Business property would present a more difficult case and it would seem undesirable to force a mortgagee to start a new business on it although there may be a duty to carry on an existing business.
>
> But when the mortgagee does operate it for how much should it be held accountable? The prevailing view is to charge the mortgagee with the fair rental value no matter what mortagee makes, letting it keep any excess and bear the loss if it makes less. In support of this it is argued that "The rule is founded in sound policy, for the reason that the particular items of expenditure, in labor or otherwise, as well as the profits received, are wholly within the knowledge of the mortgagee, and if he is not disposed to render a full and honest account, it would be impossible for the mortgagor to show them, or to establish errors in the mortgagee's account." Another possibility is to allow the mortgagor to hold the mortgagee for the fair rental value as a minimum but, in the alternative, the actual net rents and profits. This would be fair enough in case it were established that the mortgagee had intentionally falsified its accounts. It seems unduly harsh to make the mortgagee liable for all it makes when successful but to hold it for a fair rental even when unsuccessful. The only possible justification for it would be a very strong policy of discouragement to mortgagees taking possession.

Grant S. Nelson & Dale A. Whitman, REAL ESTATE FINANCE LAW § 4.28 (5th ed. 2007) (footnotes omitted). See also Annotation, *Duty of Mortgagee to Account for Rents and Profits or for Use and Occupation for Benefit of Owner of Equity of Redemption or Junior Lienor*, 46 A.L.R. 138 (1927) ("Where a mortgagee occupies the premises personally, and not by a tenant, he is liable for the fair rental value for use and occupation."). Because we conclude that Money Store II constitutes the law of the case, we need not address the merits of whether profits or fair market rental value is the appropriate measure.

22

Wells Fargo argues that the trial court erred in calculating the profits when it deducted certain interest expenses and salaries.

1.    Interest Expense

Wells Fargo argues that the trial court erred in failing to disallow a "double-counted expense: interest paid by the Restaurant Company on funds it received from T&F." Appellant's Brief at 32. Wells Fargo argues that the trial court allowed Phillips to reduce her profits by deducting payments, which included $48,361.69 in interest paid to Fifth Third Bank. Wells Fargo argues that the trial court had already granted Phillips a judgment in 2008 based on her obligation to repay the T&F loan and awarded her interest on such amounts at the rate of 8% per year from the time the repairs were made in 2004. Wells Fargo argues that Phillips is simultaneously charging the real estate interest on the loan she received from T&F to repair the Real Estate, and reducing her profits by deducting $48,361.69 in interest payments on the same loan. Wells Fargo contends that given that Phillips is already going to receive 8% interest on the money loaned from T&F, she should not be allowed to double count a portion of such interest by deducting the restaurant's payments of T&F's loan.

Phillips argues that this court's opinion in Money Store II identified what it considered to be acceptable expenses of the restaurant and included payments on the bank loan. Phillips argues that Wells Fargo's arguments carry no weight in light of this court's prior pronouncement. Phillips contends that the interest on the note constitutes an ordinary business expense which should be taken into account in determining the net profits of the restaurant.

Wells Fargo cites paragraphs 30, 31, and 38 of the trial court's 2008 order in support of its proposition that the trial court already granted Phillips a judgment based upon her obligation to repay the T&F loan. These paragraphs as well as the surrounding paragraphs of the trial court's order fall under the heading: "Findings of Fact, and Conclusions of Law The Legal Background of the Case" and state:

30. T&F obtained a loan for $150,000.00 to begin the process of repairing, maintaining and returning the Real Estate to a habitable condition for use as a restaurant.

31. After it became clear to Mr. Casagrande, Mr. Sokolik and [Phillips] that the $150,000.00 loan would not be sufficient to make all necessary repairs to the Real Estate, T&F provided additional funds in the amount of $60,000.

32. 412323 was established to operate the restaurant and seafood market, once the Real Estate was renovated.

33. [Phillips] was the driving force in these renovation efforts. She agreed that she would repay T&F for the renovations, by reason of her mortgage and judgment liens.

34. The payments that were made, as discussed below, would not have been made but for [Phillips] making the necessary arrangements for them to be paid, whether they were paid by T&F or by 412323.

35. [Phillips] admitted her responsibility and liability for the repayment to T&F and 412323 of the amounts sought herein.

36. Even if no written contract for repayment of the funds provided by T&F and 412323 exists, such a contract could be implied as a matter of both law and equity.

37. [Phillips] is the proper party to seek reimbursement for the monies spent in protecting and preserving her liens on the Real Estate and Out-lots, because the payments were made on her behalf, at her request, and pursuant to her duty as a mortgagee-in-possession. *See Miller v. Curry*, 124 Ind. 48, 24 N.E. 219, 220 (1890) allowing recovery for payments made on behalf of mortgagee-in-possession by third parties); and *Shirts v. Irons*, 28 Ind. 458, 459-460 (1867).

24

38. The same holds true for all expenses properly reimbursable to a mortgagee-in-possession to protect and preserve [Phillips's] mortgage lienhold interest in the Real Estate and judgment lienhold interest in the Out-lots under the terms of her mortgages and as allowed by Indiana law. *See Id.*; and *Wise v. Layman*, 197 Ind. 393, 150 N.E. 368, 371 (1926).

Appellant's Appendix at 235, 240-241. The portion of the court's order titled "Order" which sets forth the amounts that Phillips should recover does not specifically include the interest paid on the loan. Rather, that portion of the court's order sets forth numbered paragraphs setting forth specific amounts which total $355,476.40 and does not include the interest paid on the loan. Further, the court in Money Store II did not indicate that this amount included interest on this loan when the court stated:

> The $355,467.40 money judgment against Money Store to Phillips consists of the totals of the in rem judgment Phillips obtained against Summers and Mangy Moose in December 2003 on the assigned mortgages to the extent affirmed by the Indiana Supreme Court; the amounts paid for real property taxes and redemptions; the amount paid for insurance premiums; the amount paid for repairs; the amount for attorney fees in the first appeal, and an amount for attorney fees in the trial proceedings on appeal here.

909 N.E.2d at 460-461. Accordingly, we cannot say that the 2008 order awarded Phillips the interest payments which the court used in calculating profits in the 2010 order. Thus, we cannot say that the trial court erred in calculating the profits on this basis.

2.    Salaries

Wells Fargo also argues that the trial court erred in allowing Phillips to reduce her claimed profits by deducting $280,700 in compensation and $118,985 in health insurance benefits to her and her partners. Wells Fargo concedes that "Phillips worked to earn these payments," but argues that "the law does not license mortgagees to exploit the

25

mortgaged real estate to create employment for themselves." Appellant's Brief at 34. Wells Fargo also argues that "[i]f this Court rules that mortgagees may avoid being charged with profits merely by labeling such profits as 'compensation', then it will be far too easy for mortgagees to avoid making an honest accounting to their borrowers, as the law requires." Id.

Phillips argues that this court's opinion in Money Store II identified what it considered to be acceptable expenses of the restaurant and included salaries and health insurance. Phillips argues that Wells Fargo's arguments carry no weight in light of this court's prior pronouncement. Phillips characterizes the salaries as operational expenses and argues that a review of the compensation reveals "how meager their salaries actually were, which actually increased the business profit as compared to a scenario where outside parties would have been retained to perform the same service." Appellee's Brief at 27. Phillips contends that Wells Fargo "is simply asserting that the toils of Phillips, Casagrande and Sokolik should be invested as a charity to Money Store, to provide it with an even greater windfall from its *laissez-faire* and lackadaisical approach it has taken over the past six years toward the real estate." Id. at 27-28.

The following exchange occurred during the direct examination of Rex Harris, a certified public accountant who worked with Phillips's restaurant:

Q.    Now, in your view, um, would the salaries there be commiserate [sic] with, ah, the work duties as you know them to have been performed by each of the members?

A.    I was not at all surprised that they took a salary. They didn't take a salary the first two (2) years because of financial consideration, because they were trying to build up the cash volume, the cash flow which is typical for a start up operation. They are part-time officer

26

workers you might say, they do in my opinion, they serve a genuine need that the company has. They have the expertise and the experience of running a business and [Phillips] did not. I think it would have been difficult not to have someone do what they do. I think the amounts that they receive are reasonable considering their time they spent and the amount of experience and education they have in running a business. So I didn't; well, I don't find anything significantly out of line with their receiving compensation nor the amount that they did receive.

\* \* \* \* \*

Q. Now, putting together their salaries and the distributions received, what is your view of the reasonableness of the compensation to the members of the LLC?

A. Well, my view is that the distributions are not compensations, that's the return on their investments you might say. I think that's normally what you consider a dividend to be, not compensation but rather a distribution of profits that; keep in mind these shareholders are being taxed on profits they haven't yet received and to not give them the distributions so they can at least pay the taxes on the very money that they have reported as income is a little bit a stretch. It's difficult to explain that to a client that you're going to tax him on his share of $45,000.00 and not give him any of the money right now. So it's typical that there are some distributions made, if nothing else for no other reason than for that person to have some cash to pay the taxes that are generated from the compensations being assigned to them.

Q. And is there anything unreasonable about doing that?

A. No, no, we do it all the time.

Transcript at 175-178. Under the circumstances, we cannot say that the trial court erred in its calculation of the profits on this basis. See Johnson v. Hosford, 110 Ind. 572, 576, 10 N.E. 407, 409 (1887) (holding that payment for the services of a watchman were properly allowed where the property was exposed to danger and a watchman was necessary to preserve it from destruction), reh'g denied.

C.    Timing

Wells Fargo argues that the trial court erred when it treated the total amount of profits "as if it were a lump-sum payment against Phillips' claim made on October 14, 2010, the date of judgment," and that the court should have treated the profits as a series of payments made at the end of each year as the profits accrued. Appellant's Brief at 34-35. Wells Fargo argues that by allowing Phillips to pretend that the profits she earned each year from 2005 to 2010 were not received until October 2010, the court: "(1) disregarded the way Phillips actually handled her profits, (2) rewarded Phillips for refusing to account for her 'rents and profits' as required by law, and (3) unfairly inflated the interest accruing on Phillips' claim." Id. at 35. In other words, Wells Fargo argues that "[i]f Phillips had applied her $183,843 in profits as they accrued each year to pay down her $355,476 claim, the balance of Phillips' claim would have gotten smaller every year, and less interest would have been accruing." Id. at 37.

Phillips argues that "Money Store continually asserted that it was entitled to 'interest' on the profits," but that "[i]t was only after the trial court disregarded Money Store's argument in this regard that Money Store attempted to refashion its interest argument to be one of timely application of profits." Appellee's Brief at 28. Phillips contends that Wells Fargo "was not deprived of the use of any money, and thus its veiled request for pre-judgment interest cannot be entertained." Id. at 31.

To the extent that Phillips argues that Wells Fargo did not properly raise this issue below, we disagree. Wells Fargo raised this issue in its trial brief. Specifically, it argued:

> One solution to this issue is for the Trial Court to do what Phillips should
> have done: debit the amount of $4,415.66 against her mortgage claim each

28

month, beginning December 1, 2004. Alternatively, the Court can reach about the same result by ordering that interest shall accrue at the pre-judgment rate of 8% upon Phillips' unapplied rents and profits *from the date they accrued*, just as the Court has allowed Phillips to accrue interest on the money invested to generate those profits.

Appellant's Appendix at 558 (emphasis added). At the hearing on the motion to correct error, Wells Fargo's counsel stated "if they set off the profit against their debt that they did at accounting of every year or in January the close of the year, . . . they would have off set the amount so that the interest didn't grow as rapidly . . . ." Transcript at 297. We cannot say that Wells Fargo waived this issue, and agree with its position.

On remand, we order the court to consider on an annual basis the amount by which Phillips's lien would have been reduced by the profits and instruct the trial court to offset the loss in the first year against the profit in the second year and to offset the loss in the final year against the profit of the preceding year. See Cross v. Hepner, 7 Ind. 359, 362-363 (1855) (addressing a mortgagee in possession and holding that the sum should have been deducted from the amount of the note with interest from the time it became due until the decree was rendered).

D.    Taxes

With respect to taxes, the court's order stated:

5.    The additional expenses incurred by Phillips are taxes in the amount of $49,635.42 paid on or about August 3, 2009, and taxes in the amount of $5,634.66 paid on or about May 6, 2010.

6.    The Court finds that Phillips should have added to her first priority lien these taxes along with interest computed at the rate of ten percent (10%) per annum.

Appellant's Appendix at 72.

Wells Fargo argues that the court erred in granting Phillips a judgment for taxes that she did not pay. Wells Fargo argues that Phillips testified unequivocally that she did not pay the taxes and that Phillips's own counsel was careful to make clear to the court that the August 2009 tax payments were made by an unnamed third party and not by Phillips or the Restaurant Company. Wells Fargo argues that Phillips presented no evidence that she had any obligation to repay the parties who made the tax payments.[6]

Phillips argues that "the trial court did not find that Phillips paid the taxes; rather, the trial court found that the expenses were 'incurred' by Phillips, and, therefore, recoverable by Phillips under the terms of her mortgages." Appellee's Brief at 32-33. Phillips also argues that this issue has already been addressed in Money Store II. The portion of Money Store II relied upon by Phillips states:

> Where there is no express contract, the right to recover may rest upon an implied contract or an implied promise to pay. Cole v. Cole, 517 N.E.2d 1248, 1250 (Ind. Ct. App. 1988). Such a contract may be inferred from the conduct, situation, or material relations of the parties and enforced by law. Id. The intention to pay and the expectation of compensation may be inferred from the conduct of the parties and where equity, justice, and fair dealing require compensation. Id.
>
> Here, our review of the transcript reveals that Phillips requested help from Casagrande and Sokolik. The two men borrowed money and paid

---

[6] In its reply brief, Wells Fargo argues, without quoting the language in the mortgages or citation to the record, that Phillips's mortgages allow her to recover such tax payments only if she personally paid or incurred them. The table of contents for Wells Fargo's three volumes of appellant's appendices does not specify that the mortgages are contained in the appendices and the exhibits folders do not appear to contain the mortgages. Our review of Wells Fargo's appendices reveals that the nine mortgages Phillips purchased from National City appear to be included on twenty-one pages of which portions are illegible. See Appellant's Appendix at 126-146. We remind Wells Fargo that Ind. Appellate Rule 46(A)(8) provides that "[e]ach contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22." Ind. Appellate Rule 22(C) provides: "Any factual statement shall be supported by a citation to the page where it appears in an Appendix, and if not contained in an Appendix, to the page it appears in the Transcript or exhibits, e.g., Appellant's App. p.5; Tr. p. 231-32."

Phillips' expenses for her, and she has already begun to repay them. This evidence supports the trial court's finding and conclusion that Phillips is the proper party to seek reimbursement for the money spent protecting and preserving her liens on the real estate and outlots because she agreed to be liable and to repay Casagrande and Sokolik. See Miller v. Curry, 124 Ind. 48, 24 N.E. 219 (1890).

Money Store II, 909 N.E.2d at 459.

The record reveals that at the August 2010 hearing on remand, Phillips testified that taxes were approximately $13,000 to $15,000 a year and that the restaurant paid the taxes. On cross-examination, Casagrande testified that the real estate taxes were paid out of the cash flow of the restaurant and paid by 412323 LLC. On redirect examination, Casagrande testified that the source of the funds with respect to certain of the real estate taxes, specifically the "$29,000.00 amount and the other amount with regard to the quietus'," came from "another source" and described the source as "[p]ersonal" and "[p]rivate." Transcript at 249-250. Casagrande also indicated that "those particular tax amounts that show up on the quietus" did not come out of the operating expenses of the restaurant. Id. at 249. On recross-examination, Casagrande testified that the money was received from a personal source and "[w]e got the money and we paid it." Id. at 250. When asked whether the source was Phillips, Casagrande stated, "Not directly." Id. at 251. We cannot say that the findings and conclusions of the trial court on this issue were clearly erroneous.

E.    Attorney Fees

With respect to attorney fees, the trial court found:

7.    The Court has previously awarded to Phillips for attorney fees and expenses the amount of $71,224.02, plus legal interest.

31

8.  Phillips at this time seeks to have added to her first priority lien the additional amount of attorney fees and expenses incurred through August 31, 2010 in the sum of $92,391.70.

9.  The Court finds that some, but not all, of the additional attorney fees and expenses of litigation incurred by Phillips should be credited toward her first priority lien.

10. The amount of $20,000.00 was incurred by Phillips in arguing on appeal that she should not be required to account for the profits she was realizing in her capacity as mortgagee in possession. Phillips' argument regarding profits did not prevail on appeal.

11. The Court is aware that a mortgage appearing in the chain of title of Phillips authorizes her, as mortgagee, to recover as costs reasonable attorney fees in protecting her lien. This Court, however, can look at all of the surrounding circumstances of the litigants before it in determining what amount constitutes a reasonable attorney fee.

12. Having done so, the Court finds that Phillips should be awarded additional attorney fees and expenses of litigation in the amount of $72,391.70.

Appellant's Appendix at 73.

Wells Fargo argues that the fees awarded by the trial court "clearly included substantial fees incurred by Phillips in preparing for the trial on remand, concerning the amount of her rents and profits." Appellant's Brief at 40-41. Wells Fargo argues that the mortgages held by Phillips do not allow her to recover attorney fees incurred in litigating the accounting ordered by this court. Wells Fargo cites to the portion of the Court of Appeals opinion that was summarily affirmed by Money Store I. Wells Fargo argues that "most of the work done by Phillips' attorneys, at a cost in excess of $70,000, was in preparing – and defending via discovery, briefs, and trial testimony – an 'accounting' that claimed Phillips' profits from the Real Estate were only $92,361." Id. at 41. Wells Fargo argues that it "was obliged to incur heavy litigation costs of its own to help the Trial

32

Court see that this figure was grossly understated, an effort which led the Trial Court to increase the profit figure to $183,843.75." Id. Wells Fargo argues that "[t]his $91,000 victory, however, becomes Pyrrhic if Phillips' attorneys are again allowed tens of thousands of dollars in compensation for fighting to impose an unfair accounting on Wells Fargo." Id. Wells Fargo argues that "[t]his work cannot be classified as work done 'to protect the lien of this mortgage or any of the Mortgagee's rights" under the mortgage. Id. Wells Fargo requests that we remand and direct the trial court to "reexamine the fees claimed by Phillips's attorneys and disallow fees attributable to the effort to create and defend Phillips' $92,361 accounting, which was found to significantly understate Phillips' profits." Id. at 41-42.

Phillips argues that "it is clear from the invoices submitted into evidence that said $20,000.00 was for time incurred in performing the very same tasks which Money Store now seeks to have excluded." Appellee's Brief at 34. Phillips argues that her counsel "did not incur $20,000.00 in research and briefing time on the single issue of *whether an accounting was or was not required*." Id. at 35. Rather, Phillips argues that "the $20,000 in fees was with regard to actually performing and presenting the accounting."[7] Id.

---

[7] Phillips argues that "regardless of the grounds for which the trial court discounted Phillips' attorneys' fees by $20,000.00, Phillips' mortgages at the foundation of this case allow for all of Phillips' attorneys fees, including those relating to any accounting, to be incorporated into her first priority lien interest." Appellee's Brief at 36. Phillips argues that "all of [her] fees, including those relating to any accounting, have been incurred in relation to the Real Estate, and in protecting her lien interest and, thus, are properly awardable." Id. To the extent that Phillips appears to suggest that the trial court erred by excluding $20,000 from the amount of attorney fees she was entitled to recover, we observe that Phillips also stated that "the trial court was well within its discretion in making its determination regarding the amount of fees that should attach to Phillips' first priority lien interest" and requests that we affirm the trial court's judgment. Id. at 37.

In its reply brief, Wells Fargo argues that Phillips's claim is refuted by the trial court's judgment which explicitly states that $20,000 in fees disallowed by the court were for work on the appeal in <u>Money Store II</u>, not for work on the accounting presented on remand. Wells Fargo argues that the court's discretion to award attorney fees is not unfettered and that the court abused its discretion "in allowing Phillips' [sic] all of the $50,000 in fees sought by her attorneys for preparing and litigating an accounting that Phillips ultimately had to stipulate was off by $91,000, nearly half of the total amount." Appellant's Reply Brief at 24. Wells Fargo concludes that "[t]his Court would be justified in denying recovery of any of the attorney's fees requests for this 'accounting.'" <u>Id.</u>

With respect to the calculation error, the trial court found:

22. During the course of trial, it became apparent to the Court and counsel, that the experts selected by the litigants to testify had twice subtracted certain expenses in their net profit calculations for the restaurant. They were unaware that this Court had previously calculated certain expenses and made same a part of the first priority lien determined to be owed to Phillips in the amount of $355,476.40.

23. Counsel stipulate, and the Court so finds, that the net profit figure of $92,361.51 must be adjusted upward to reflect the error made by the parties' experts as follows:

   d) Taxes – $59,198.00
   e) Insurance – $18,950.00
   f) Repairs – $13,334.24

   TOTAL ADJUSTMENT:  $91,482.24.

Appellant's Appendix at 76-77.

While we acknowledge that the initial accounting was erroneous, we observe that Wells Fargo does not argue that the trial court's finding that the "parties' experts" erred

34

was improper, that at least one of Phillips's assigned mortgages contained an authorization for attorney fees "necessarily incurred therein by the Mortgagee to protect the lien of this mortgage or any of the Mortgagee's rights hereunder," 822 N.E.2d at 234, and that this court ordered an accounting for the profits of the restaurant to be applied to the amount due on Phillips's first lien. See Money Store II, 909 N.E.2d at 462-463. Under the circumstances, we cannot say that the court erred in awarding attorney fees.

For the foregoing reasons, we affirm in part and remand in part.

Affirmed in part and remanded in part.

BAKER, J., and KIRSCH, J., concur.